JERSEY CITY, HOBOKEN AND PATERSON STREET RAILWAY. COMPANY

*v.*

THE NEW YORK, SUSQUEHANNA AND WESTERN RAILWAY COMPANY et al.

[Submitted June 15th, 1901.   Decided August 29th, 1901. Filed December 21st, 1901.]

1. When two railways cross each other at grade and being unable to agree upon proper provisions for protection against collision submit that question to the determination of this court, it has jurisdiction to determine it.

2. Principle upon which the court will act in making such determination discussed.

On bill, answer, cross-bill and replication.

*Mr. William B. Gourley,* for the complainant.

*Mr. Charles L. Corbin,* for the defendants.

PITNEY, V. C.

The complainant is the owner of a system of street railways in the city of Paterson, and the defendant is the owner of a double-track steam railway passing through that city. The complainant has constructed a street railway, as an addition to its

existing system, through Governor street in that city, on both sides of the defendant's steam railway tracks and desires to connect the ends of its tracks, and for that purpose to effect a crossing of the defendant's tracks at grade. The parties are unable to agree upon the mode of crossing and the precautions necessary to prevent accidents thereat, and the defendant refuses to allow the complainant to disturb its tracks to make a crossing until the mode shall have been agreed upon or determined by competent authority. The object of the bill is to obtain from the court a judicial expression of the proper mode of crossing and precaution against accidents, and to compel the defendant to submit thereto; and defendant, by its answer and cross-bill, prays, in effect, the same relief—that is, that the complainant shall not cross except upon terms to be settled by the court; and both parties distinctly submit themselves to the jurisdiction of the court in that respect.

Some question was raised by the pleadings as to which had the prior right in the *locus in quo,* the defendant for its railroad or the public for the street. Both seem to have been laid out about the same time. No point, however, was made of this at the hearing, and the case was tried as if each party had an equal right in the *locus in quo,* and the jurisdiction of the court was based upon the familiar principle that where two carriers have a right of common easement in a place the mode of its use may be determined by this court.

If the *locus in quo* had not been within the territorial limits of the city of Paterson the case would have come within the statute of March 22d, 1895 (*P. L. of 1895 p. 462*), which, in such case, requires an application to the chancellor, with notice to the township authorities, to determine in a summary manner the mode of crossing. The object of that act is declared to be, that

"such crossing shall be made in such a way as will inflict the least injury upon the rights of the company owning or operating the railroad intended to be crossed, and as will afford proper protection to the public,"

and the chancellor, under the act in question, is authorized, if in his judgment it is reasonably practicable, and public safety

so requires, to avoid a grade crossing, to require that the crossing shall be above or below grade.

It seems to me that in determining the question presented by the pleadings this court must have in mind the same considerations which would influence it if the application were made under that statute and the crossing were outside of the city limits.

Coming now to the evidence in the case, it shows that there is considerable travel over the steam railway at this point, some sixty trains a day passing one way or the other; that there are several switches near the point in question, on which freight cars are switched out to private yards in the neighborhood. Another street, namely, Tyler street, crosses the railway near and parallel to Governor street, and for the protection of the ordinary traveling public at those points the defendant company has erected a tower between the two streets, but nearer to Governor than to Tyler street, with wires operating gates across both streets in such a way that the operator can stop travel thereon. The same operator also attends to a system of signaling which the railroad has occasion to use at that point.

The line of street railway through Governor street is intended to reach the northern part of the city of Paterson east of the defendant's railway, and between that and the Passaic river at a place in the bend of that river, which is at present laid out in streets and is eligible for residential purposes, and, although at present rather sparsely occupied, it is expected will be built up and become an important residential part of Paterson. It is contended by the complainant that at present there will be little travel over its road at the point of crossing, and hence but little danger, and that the danger does not warrant much expense. But the fact that the complainant company thinks it worth while to build a street railway in the direction of and leading to the neighborhood mentioned, and that it is one which promises well for residential purposes, leads one to expect that there will in time be considerable travel over the complainant's railroad; and in determining the mode of crossing regard must be had to the probable future as well as to the present situation.

The complainant contends that its present mode of protecting

itself and the public against accidents is sufficient, namely, that its cars shall stop when they reach the defendant's tracks, the conductor shall alight and look up and down each track, each way—there is an unobstructed view for a considerable distance at that point—and stand on the track until the car has crossed, and that this method is in use in other places in Paterson. The complainant goes further and says that it is willing to put derailing devices on each side of the defendant's tracks, whose natural position will be open and can only be closed by a lever located between the defendant's tracks; so that it will be impossible for a street car to cross the defendant's tracks without a man standing between the tracks to close the switch by lever there to be placed. This apparatus will cost a considerable sum of money and its operation will delay the passing of the complainant's cars across the defendant's tracks a greater or less length of time. The defendant's objection to this plan is that the device so suggested, though in general use, has not proved sufficient to prevent accidents, for the reason that sometimes the power which propels the street car fails at a moment when the car is on the steam railroad and becomes there stalled, so to speak, and may be run down by a train.

I am satisfied that this danger is real and important. The proofs show that the very thing has happened in several instances in the city of Paterson, and great danger to life has resulted.

The plan proposed by the defendant is called the interlocking signal system. Briefly stated, it is a tower built on or near the point of crossing of the two roads, and in that tower are placed wires connected by levers with signals each way on the defendant's road, at a distance sufficient to insure the stoppage of a train before it reaches the point of crossing. The interlocking feature consists in a wire connection, by which a single movement necessarily shows a signal on each road on each side of the crossing, that on the street railway being near the crossing. This is the system which was advised by me, and resulted in a decree, made in 1895, in the case of the crossing, by the street trolley company, of the Watchung railroad at Bloomfield avenue, in Essex county, outside of the limits of any city. That question

received careful consideration by me at the time, and the result was acquiesced in by both parties.

The complainant does not object to such a protection in this case, but it does object to paying any considerable portion of the expense of its installation and maintenance. The first cost will be about one thousand and eight hundred dollars, and it will require about one thousand dollars a year to maintain it. In the Bloomfield avenue crossing case I assessed two-thirds of the cost of installing and maintaining upon the steam railroad and one-third upon the street railway.

Serious objection is made by complainant to the application here of that plan, on two grounds—*first,* as before stated, that the amount of travel over the crossing, and the danger, under the circumstances of this case, are not sufficient to warrant the expense of it; and *second,* that there is no occasion for it, because the defendant railway company already has a tower and a man in it, with appliances by which ordinary gates can be, and are, now shut at any time that an ordinary vehicle approaches the tracks from either side, and that arrangement is sufficient to protect the street railway company. For reasons given by the engineers, and explained at the hearing, it seems to me that the latter reason does not apply. The gates in use are not sufficiently strong to prevent a trolley car from making its way on to the steam railroad tracks, and do not prevent the danger which arises from a car becoming stalled on the tracks. Nor, in case of the installation of the interlocking signal system, is it practicable for the present signal system in use to be operated by the same man in the same tower. I think it quite clear that if the interlocking system is adopted, it must be a thing by itself, independent of the other signal system now in use. It may, in a measure, dispense with a part of the present system, and from that circumstance the steam railway company will derive a benefit. On the other hand, the use of the interlocking signal system will save time to the trolley company, and enable it to run its cars directly across the railway without stopping, except when the signal is set; or, if it still desires to protect itself by sending the conductor ahead, it will certainly save the considerable expense attending the installing upon the street railway of the

derailing system, controlled by lever between the tracks of the steam railroad.

It was said by the complainant that the Bloomfield avenue crossing over the Watchung railroad was a much more important crossing than the one here in question; but my recollection of that case is, and I think it is general knowledge, that travel over the Watchung railroad is but a mere fraction of that over the defendant's railway; and while the number of street cars running over the Watchung railroad at the time that matter was settled, in 1895, may have been much greater than those which will at first pass over the place here in question, yet the strong probability is that the travel in the present case will very much increase in years to come.

The defendant seems to be actuated by a desire to take a stand and make a precedent, so that hereafter these street crossings shall be properly protected. That desire on the part of the defendant seems to me to be commendable.

I may add that I can see no motive which the defendant company can have in asking for terms of crossing which are unfair or oppressive to the complainant. Both are interested in the building up of the city of Paterson, and the complainant's road is in no sense or degree, as far as I can see, a rival of the defendant's road.

The solution of the question presented is a difficult one. It is a matter of pure judgment, in which there is no precedent upon which the court can rely, unless it be the Bloomfield avenue case.

I have spoken of the interlocking system. There are two systems. There is an interlocking signal system and the interlocking signal and derailing system. In the one reliance is placed entirely upon signals given at a long distance on the steam railroad and at a short distance on the street railway. The signal and derailing system provides, not only a signal, but also a derailment on both tracks, so that if a signal is overlooked by the engineer or motorman the train will be derailed before it reaches the point of crossing.

I have come to the conclusion that one or the other of these systems must be applied, but whether the derailing feature must be added to the signal system was not much discussed, and I

prefer to hear counsel upon that subject. If the simple signal system is considered sufficient, I shall direct that the defendant company pay two-thirds of the cost of installing and maintaining it and the street railway company one-third. The terms of the decree may be similar, so far as applies, to those in the Bloomfield avenue case.

Leave will be reserved to either party to apply at any time to vary the terms of the decree determining the division of the cost of maintenance.